HONORABLE RONALD B. LEIGHTON

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

JANET MARKS,

11                              Plaintiff,

12              v.

13    TANA HASART, in official and independent
      capacities, and SUSAN HOYNE, in official
14    and independent capacities,

15                              Defendant.

16

Case No. C03-5446RBL

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

17          This matter is before the court on Defendants' Motion for Summary Judgment. [Dkt. #17]  The case

18    involves the termination of Plaintiff Marks from her employment at Clark County Community College, where

19    she was employed for 16 years.

20          Ms. Marks claims that she was fired for speaking out on matters of public concern, in violation of her

21    First Amendment rights.  Defendants seek summary dismissal of all her claims, arguing that her speech was

22    not so protected, that she was not fired for her speech in any event, and that even if she were, they enjoy

23    qualified immunity for their actions.

24          The Court has reviewed the parties legal and evidentiary submissions, and the record and files herein.

25    The matter is well-briefed and oral argument is not required to resolve the Defendant's Motion.

26          **1.      Factual Background.**

27          Though the merits of Plaintiff's claims and Defendants' defenses are hotly contested, the factual context

28    of the dispute was well documented at the time it arose, and the parties have supplied a thorough record for

1    the court's review.

2        Ms. Marks began her employment at the College in 1986.  From 1991 to 1996, she was the College's

3    "Alternate Chief GED Examiner."  She was the Chief GED Examiner from 1996 to 2001.  Her claim arises

4    from her actions in that post, her subsequent re-assignment, and her ultimate termination from the College's

5    employ.

6        Defendants supply uncontroverted evidence that, as early as 1999, the College hired an outside

7    consultant to review the College's Education division, including its GED program.  The outside consultant,

8    Ms. Wallis, recommended that the college consolidate that program with its general testing program and

9    eliminate redundant testing locations and administrative positions.

10       The President of the College, Defendant Hasart, apparently agreed with these recommendations and

11   in 1999 began implementing changes, which she anticipated would take several years.  Plaintiff Marks admits

12   that she was aware of this plan, and that she determined that it was likely to result in the loss of her position.

13   She consulted with an attorney about that fact, and sought (and obtained) other employment during the 2000

14   time frame.

15       According to the Defendants, by the Summer 2001, the planned changes were imminent, and at the

16   same time Marks began having "performance issues."  Her immediate supervisor, Mark McLean, and her

17   "second level" supervisor, Defendant Hoyne, wrote a memo outlining these deficiencies and their expectations

18   about her conduct (including specifically using common sense when communicating with others) August 23,

19   2001.  This memo included the expectation that Marks was not to contact the Washington State Board of

20   Community and Technical Colleges (WSBCTC) directly, without permission of her supervisors.

21       According to the Plaintiff, during this time frame she began expressing her concerns about the College's

22   GED testing administration.  It is agreed that she wrote several emails to her supervisor, and to Alleyne Bruch,

23   who was the administrator of the WSBCTC.   In the summer and fall of 2001, Marks reported to Bruch a

24   variety of what she perceived as shortfalls in the College's GED testing administration.  These included

25   breaches of confidentiality, the removal of a door (a security risk), and her claim that she had been told by her

26   College supervisors not to perform special accommodations for disabled test takers.  From the Defendants'

27   perspective, Marks had sought to set up a disabled testing procedure overseen by an uncertified College

28   employee, contrary to its policies.  She was instructed to follow the College's procedures, and informed that

ORDER
Page - 2

1   Bruch had been told of the "disability referral policy." Thereafter, requests for disabled test access were

2   handled through the Office of Disability Support, and not through Marks.

3       It is agreed that on October 8, 2001, Marks emailed Bruch and specifically requested that the College's

4   GED testing facility be immediately closed and relocated. From Marks' perspective, she did so in light of the

5   repeated violations described above, and described in Marks' earlier emails. As a result, the WSBCTC did

6   close the College's testing program temporarily. Marks made this request to Bruch without consulting

7   McLean or Hoyne, or anyone else at the College. When Hoyne learned of it, and of the WSBCTC's order that

8   the College immediately stop testing, she obtained a "stay" of that order from the WSBCTC. October and

9   November testing then proceeded under a different examiner.

10      As the result of Marks' October "report" to WSBCTC, she was placed on administrative leave by the

11  College, and told not to contact the State GED supervisor. The battle continued throughout the next month,

12  as Marks exchanged increasingly lengthy and accusatory emails[1] with her superiors, repeatedly suggesting they

13  were retaliating against her for exercising her first amendment right to speak on matters of public concern.

14  She was also instructed to temporarily report to another location, directly to Ms. Hoyne, and her job duties

15  were reduced, though for some time she apparently remained Chief GED examiner, at least in name.

16  During this period, Marks continued to report what she felt were problems with the GED testing protocol, and

17  her confusion over whether and where testing was taking place. On October 31, Bruch and the State audited

18  the College's GED testing program. Marks was present. Shortly thereafter, Bruch issued a letter to the

19  College finding that Marks' claims of impropriety were unfounded.

20      In a meeting to discuss this result, Marks did not agree, and complained that Bruch did not "ask the

21  right questions." She wrote a letter documenting the meeting, and asserted that the college wanted to

22  compromise the GED testing as a means for having her dismissed for cause. She also claimed, again, that she

23  was the subject of retaliation. She complained about her treatment, that the conduct of the College was

24

25      [1]Defendants Move to Strike these emails as hearsay, They are attached to the Declaration of Marks'
26  attorney, Thomas Doyle, and he has not authenticated them. However, it is clear from the deposition excerpts
    that at least some of the documents were authenticated by various witnesses, and Defendants do not claim they
27  are not authentic or are otherwise unreliable. Indeed, some were submitted by them. The better practice is
    to introduce such evidence through a Declarant who can overcome such evidentiary objections, or to attach
28  deposition excerpts specifically authenticating the documents. However, there is little doubt that the
    documents were sent and received (and many are authored by Defendants, and are not hearsay). Defendants'
    Motion to Strike is DENIED.

ORDER
Page - 3

unethical and illegal, and insisted that the college replace her door, restore her email and phone and keys, and pointed out that she was still the only GED Examiner the College had.

On November 29 (three weeks later), Hasart informed Marks that she was no longer the College's Chief GED Examiner, and in a separate letter reiterated that she had been placed on administrative leave and temporarily reassigned to Hoyne, outlined the terms of that reassignment, and stated that it was likely to last until the end of the year. The letter also instructed marks to refrain from contacting anyone related to the GED testing absent instruction from Hoyne.

The next event referenced by either party is the January 24, 2002 layoff notice to Ms. Marks. It apparently referenced the long planned reorganization of the GED testing section.

Marks sued under 42 U.S.C. §1983, claiming that she was the subject of retaliation for speaking out on matters of public concern, in violation of her First Amendment Rights. She claims she suffered adverse employment action in the form of her leave, reassignment, and being placed on a "short leash." She also complains that her office door was removed, her phone and email and computer access terminated, and that she was ultimately laid off (fired) for her speech.

Defendants move for summary dismissal of her claims, arguing that even taking the evidence in the light most favorable to Marks, her speech was insubordinate and false and related to personal rather than public concerns. They argue that Marks was terminated as part of the reorganization of the GED testing that was long planned, not for her speech. Finally, they argue that even if the evidence supports the conclusion that Marks was terminated for protected speech, they enjoy qualified immunity for their actions.

**2.      Summary Judgment Standard**

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

**3.      First Amendment Protection.**

Ms. Marks claims she was demoted and then terminated in retaliation for speaking out on matters of public concern. She claims that her First Amendment right to Free Speech was therefore violated.

In evaluating such a claim, the court considers the following elements: (1) whether the plaintiff was engaged in an activity that is entitled to constitutional protection; (2) whether her exercise of the constitutionally-protected right was a "substantial" or "motivating" factor in the defendant's action; and (3) whether the defendant has established that it would have taken the same action in the absence of the protected conduct. *Rendish v. City of Tacoma*, 123 F.3d 1216, 1219 (9th Cir. 1997); *see also  Mount Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287 (1977).

In order for a public employee's expression to be constitutionally protected within the meaning of step one, two separate conditions must be satisfied. First, the speech must touch on a matter of "public concern." If it does not, then the First Amendment is not implicated at all, and it is unnecessary to scrutinize the reasons for an employee's discharge. See *Connick v. Myers,* 461 U.S. 138, 146 (1983). If it does, then the reviewing court must determine whether the employee's interest in expressing himself outweighs the employer's interest in preventing potential workplace disruption. In striking that balance, courts look to the balancing test first articulated in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968):

> The question of whether speech of a government employee is constitutionally protected expression necessarily entails striking a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

The Supreme Court has recognized that, in conducting the *Pickering* balance, courts must grant public employers wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. *Connick*, 461 U.S. at 151.

Under the facts of this case, whether Marks' speech touched on a "public concern" is a close question. Defendants' theory that Marks manufactured or exaggerated her concerns in order to insulate herself from the

planned GED reorganization certainly finds factual support on the record, but it is not one the Court can or will adopt on summary judgment.  At least some of the speech, early on[2], could be found by a fact finder to touch on matters of public concern as that term is used in Supreme Court authority.  The public has an interest, for example, in the availability of GED testing to disabled students, and in the security of GED testing materials.   Of far lesser concern to the legitimate public interest are Marks' complaints (contained in her October 8 email to Bruch) about her door being removed, her claim that restrictions were placed on her ability to communicate directly with the state absent supervisor approval, reports that her superiors were uncomfortable about the way she was being treated, complaints about her mail, email, and phone, and her allegations that her supervisors were to become alternate GED examiners.

The court's focus is on the second part of the question, the *Pickering* balancing test.

In evaluating whether the employee's right to speak is outweighed by the employer's (specifically a public employer's) interest in "promoting the efficiency of the public services it performs through its employees," the court looks to a number of considerations.  These include the potential disruptiveness of the speech, whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.  *See Pickering*, 391 U.S. at 570-573.

Defendants argue that Marks efforts to "alert" the WSBCTC and Bruch in the form of her October 8 email were designed to disrupt (and in the absence of swift intervention) would have disrupted the College's GED testing.  They argue further that her efforts were both insubordinate and false.

Plaintiff responds, somewhat irrelevantly, that her email was not in fact disruptive because  the testing closure was immediately rescinded.  It is clear, however, that the *potential* for disruption, and not any actual disruption is to be considered by the court in conducting a *Pickering* balance test.  *See Brewster v. Bd. of Education of Lynwood Unified School District*, 149 F.3d 971 (9th Cir. 1998).  Plaintiff had been

---

[2]It is less clear that other complaints and communications made by Ms. Marks are within the public's interest.  Her complaints about having to go through proper channels in order to make her statements, and her admitted refusal to do so, raise other issues discussed below.

warned about "overreacting" and "calling the State" in August, and had admittedly failed to inform her superiors that she was going to contact Bruch, much less that she was going to recommend immediate closure of the testing facility at what all agree was an extremely inappropriate and "crucial" time.

Even after the October 8 email, Marks was warned to discontinue direct contact with the state, and the record is replete with proof that she continued nevertheless. Indeed, she admits that she directly disobeyed these instructions (though she complains that they made "no sense" – an entirely different issue.)

Marks attempts to characterize herself as a "whistle blower" in an effort to excuse this conduct. The court has reviewed all of the evidence, and it is not at all clear that she ever sought the required permission prior to repeatedly contacting Bruch, and making significant recommendations without her superiors' knowledge or consent. Marks' "speech" was therefore insubordinate as a matter of law. It directly and blatantly undermined the efforts of her department and had its intended effect of "interfering with the regular operation of the enterprise." Furthermore, while the ultimate truth of the speaker's statement is not dispositive, it turns out in this case that Bruch determined that the "violations" and breaches of which Marks repeatedly and loudly complained were in fact unsubstantiated. This factor weighs heavily in favor of the Defendants' right and attempt to restrict Marks' ability to contact Bruch directly, and to discipline her for flatly and repeatedly ignoring their instructions.

The Court concludes as a matter of law that if there were some part of Plaintiff's communication that did address an issue of public concern, the Defendants' interest in enforcing management authority over her rank insubordination nevertheless outweighs her right to express herself in the manner that she did.

**4.    Marks' Speech as a Substantial Factor in Her Ultimate Termination.**

Defendants also argue that even if Marks' speech was protected, it did not play a substantial role in her ultimate termination as a part of Reduction in Force that was first adopted in 1999. They argue that marks would have been laid off in any event, even absent the speech.

This argument is based on the fact that the "RIF" was planned (and Marks knew it would result in the elimination of her job) well before the GED testing controversy arose.  Given the repeated threat of disciplinary action (including the November 29, 2001 reprimand) by the College against the Plaintiff, viewed in the light most favorable to her, this presents a question of fact. Plaintiff argues that she did not even work in the GED department at the time of the lay off, but it is also clear that she was only temporarily assigned out of that department.   It is also apparent that Plaintiff declined to accept other positions at various steps along the way, but this is not an issue that can be resolved in the Defendants' favor for purposes of summary judgment.

**5.      Qualified Immunity.**

Defendants in a § 1983 action are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The existence of qualified immunity generally turns on the objective reasonableness of the actions, without regard to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable officer could have believed his or her conduct was proper is a question of law for the court and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872-73 (9th Cir. 1993).

In analyzing a qualified immunity defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001).  "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*.  The privilege of qualified immunity is an immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. *Id*.

ORDER
Page - 8

The first inquiry is whether (viewed in the light most favorable to the non-moving party) the facts show that the Defendants' conduct violated a Constitutional right.  As discussed above, the court does not conclude on the facts presented that Marks' speech was entitled to First Amendment protection. Assuming,  however, that it was (and that her speech played a substantial role in her ultimate lay off) the court concludes that the defendants are entitled to qualified immunity for their actions.

As the Defendants point out, the Pickering balancing test is a fact based, case-by case analysis.  For this reason, in all but the most egregious cases, the constitutional protections attached to the speech are rarely "sufficiently clearly established" to overcome qualified immunity.  *See Moran v. State of Washington*, 147 F.3d 839, 844-45 (9th Cir. 1998).

Here, Marks' right to engage in the speech she did, despite the restrictions placed on her prior to doing so (i.e. prior approval) was not so clearly established that a reasonable officer in the Defendants' position would have known that they could not discipline her for speaking when, and as, she did.  They are therefore entitled to qualified immunity in any event.

Janet Marks' First Amendment claim therefore fails as a matter of law.  The Defendants;' Motion for Summary Judgement [Dkt. #17] is therefore GRANTED and Plaintiff's  Complaint is hereby DISMISSED.

DATED this 26th day of August, 2005

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE